## In re KATZ.

### (District Court, D. New Jersey.  June, 1914.)

BANKRUPTCY (§ 136*)—CONCEALMENT OF ASSETS—ORDER AGAINST BANKRUPT.

A bankrupt, who conducted a mercantile business, within 60 days prior to the bankruptcy bought goods on credit to the amount of $20,700. The amount paid to creditors during the same time and the value of the stock on hand aggregated $7,900. It was also shown that during that time bankrupt drew from the bank and received from collections cash to the amount of about $12,000, which was wholly unaccounted for, except by testimony that he paid various sums to different relatives from whom he claimed to have borrowed money. Such testimony was, however, directly contrary to prior statements made by the bankrupt to mercantile agencies and inconsistent with other proven facts, and in many respects improbable and unreasonable. *Held*, that the evidence warranted a finding by the referee that the bankrupt had concealed and had in his possession or under his control money to the amount of about $12,000, and an order requiring him to turn over such sum to his trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 233, 235; Dec. Dig. § 136.*]

In Bankruptcy. In the matter of Harry L. Katz, bankrupt. On review of order of referee requiring bankrupt to turn over to his trustee the sum of $12,007.43. Affirmed.

Referee Chandler stated the facts and filed his opinion, as follows:

An involuntary petition was filed against the bankrupt August 28, 1912, accompanied by a petition for a receiver. W. L. Moise was appointed receiver, and subsequently he was appointed trustee. Katz was adjudicated a bankrupt on September 16, 1912. On October 5, 1912, the attorneys for the bankrupt filed schedules setting forth liabilities to creditors holding securities for $2,875 and a list of 140 unsecured creditors unaccompanied with any information as to the amounts respectively or in the aggregate due them; subsequently 145 creditors filed claims for $29,878.37; total proven liabilities, $32,753.37. A number of creditors for an aggregate of several thousands of dollars neglected to file their claims within a year and their claims were disallowed. The schedules showed assets: Stock in trade, $2,700; vehicles, $500; machinery, tools, etc., $1,500; debts due on open account, $4,025.29. Total $8,725.29. The receiver and trustee sold the personal property for $3,075.30, and collected $1,333.04 of the debts due on open accounts. Total $4,408.34.

The bankrupt came to Atlantic City, N. J., from New county, Pa., in 1906, accepted employment in one of the large hotels as a steward at a salary of $800 a year, which was increased from time to time until March, 1912, when his salary was $2,100 per annum. During this period out of his salary, he saved(?) so he testified, about $14,000. In October, 1911, he purchased a fruit store in Atlantic City, for an agreed price of $5,800, paying therefor $3,000 in cash and securing the remainder by a chattel mortgage for $2,800. He placed his brother in charge of the store and employed A. Frugoli as an assistant. From the latter he borrowed $1,000. The bankrupt is an expert bookkeeper. At the opening of business he kept a cash book, ledger, sales book, and purchase book. On May 14, 1912, he made a signed statement to the Fruit & Produce Trade Association of New York. This was an exhibit produced at his examination. In this report he claimed his assets consisted of "cash, value of stock on hand, $5,500; outstanding accounts, considered good, $10,000; plant, fixtures, improvements, $8,750; savings bank accounts, $5,500; horses, wagons, trucks, etc., $1,800; cash on hand, $2,275.84; total, $28,325.84." Liabilities: "For merchandise, $2,000; chattel mortgage, $2,-875; total, $4,875." On August 9, 1912, the bankrupt verbally stated to Brad-

street's that his assets were $29,475, with liabilities of $7,375. During the period between July 1 and August 28, 1912, the bankrupt purchased on credit merchandise aggregating $20,700, and paid to creditors $5,200.

After several examinations of the bankrupt the referee and the general body of the creditors entertained the belief that the bankrupt was fraudulently concealing a large sum of money. The creditors organized, appointed a creditors' committee, and contributed the sum of $1,150 to prosecute a complete investigation into the past history of the bankrupt, his family's and relatives' business connections with him, and his business methods. This committee employed able counsel and detectives, with the result that the committee was able to submit evidence of fraudulent transactions upon which an order was entered by the court on the recommendation of the referee, requiring the bankrupt to surrender $12,007.43 of concealed assets. The balance of the principal facts in the case appear in the following conclusions and reports of the referee and the opinion of the court:

The stock in the store on the day it was turned over to the receiver was estimated to be worth $2,700, as appears by the sworn schedule filed by the bankrupt, and assuming that this stock was entirely represented by a portion of the $20,500 worth purchased between the dates above mentioned, and that $5,200 had been paid to creditors, the total sum of the value of the stock plus the amount paid to creditors would be $7,900, leaving an apparent discrepancy of $12,800 worth of merchandise sold during the 60 days or less that intervened between the day it was purchased and the date of closing the bankrupt's store, and the bankrupt has in no wise accounted for the disposition of this large sum of money. Additionally to this it was testified by the bankrupt and his employés that they were purchasing from $100 to $200 worth of goods a day for cash from local dealers, which goods were presumably being sold at a profit. From August 19th to August 26th the testimony of the bankrupt and his brothers was to the effect that $6,300 was drawn from the bank account of the bankrupt and turned over to the bankrupt in cash.

It was proven, and not denied, that during the last few days prior to the closing of the place of business the bankrupt collected from his customers who were indebted to him $5,707.43 in cash, which sum was not turned into his bank account; and I think it fair to assume that an additional large sum of money, probably aggregating some thousands of dollars, was similarly collected by the bankrupt and appropriated to his own use, and it is a significant fact that the aggregate of these two sums is within a few hundred dollars of the difference between the amount of goods purchased from the bankrupt's creditors during July and August, and the amount paid to these creditors plus the estimated value of the stock on hand at the time of the failure, so that it seems to me to have been conclusively proven that the bankrupt appropriated and is withholding from his creditors the sum of $12,007.43.

Testimony was offered on the part of the bankrupt to establish a payment to Samuel Katz, a relative living at York, of $1,500, which the bankrupt claimed he had borrowed from this relative and had repaid. In view of the fact that the signed and verbal statement made by the bankrupt both before and after this alleged loan was made to him by his relative, Samuel Katz, to the effect that he owed no borrowed money, coupled with the further very indefinite and evasive manner in which all of the testimony concerning this loan was produced before the referee, is convincing to the referee that no such loan as alleged was ever made to the bankrupt by his relative Samuel.

The bankrupt further claims to have borrowed from his brother, Moses, $2,087.45, and it is alleged that this money was paid to Moses in August, 1912, just prior to the bankruptcy. If the bankrupt borrowed any such sum from Moses, he did not deposit it in any of his various bank accounts, and at the time of the alleged loan there was no apparent concealment or effort made on the part of the bankrupt to withhold any moneys from deposit in one or the other of his various accounts. Another significant fact with relation to this alleged transaction is that both the bankrupt and Moses testified that the $1,200 that the bankrupt borrowed from Moses was repaid to Moses in April, 1912. This alleged loan would be subject to the same charge of not having been disclosed in the signed and verbal statements above referred to,

if any such loan ever existed. The referee concludes from the testimony as submitted that this alleged loan on the part of Moses was not in fact a loan, and, while the check shows that it was cashed by the bankrupt, the referee believes that, when so cashed, the cash was turned over to Moses by his brother, Harry.

This bankrupt claims to have borrowed $1,200 from his brother, Emanuel Katz. The referee, the creditors' committee, and the trustee, accompanied by the attorneys for the bankrupt, and the trustee, went to Hanover, Pa., the former residence of Emanuel Katz, to endeavor to ascertain the truth with respect to this transaction. In his original examination the bankrupt claimed that he paid this money to Emanuel in April or May. If he did not pay it until June, the signed statement he made in May was a false statement. When cross-examined, Emanuel Katz could not tell where he procured this money which the bankrupt claimed was loaned to the bankrupt, could not tell whether his wife got it from the bank or whether she had it on her person, and the testimony of both Harry and Emanuel with relation to this transaction was conclusive to the referee that neither of them was telling the truth, and on the testimony taken on the rule to show cause no effort was made on the part of the attorney for the bankrupt to corroborate the testimony of the bankrupt with relation to the facts concerning this transaction if there ever was such a transaction.

The bankrupt sought to explain discrepancies in his testimony by alleging that he had borrowed $2,200 from one Abe Cooper, of Harrisburg, Pa., a relative, and that he repaid this sum to Cooper personally in cash in Atlantic City in January or February of 1912. Cooper was not produced to substantiate these statements, and it is unbelievable that the bankrupt ever had any such negotiation with Cooper, especially in view of the fact that at the time he alleged he was borrowing money he also alleged that he had ample cash resources on hand.

The bankrupt also claims that he borrowed $2,800 from his father; this sum being the proceeds of a sale of a stock of furniture at Hanover and the loan having been made by the father to him in cash. The testimony shows that during the entire period of his business career the bankrupt was sending money to his father, and there is no testimony to corroborate any such loan by the father to the bankrupt and of such a character as is entitled to the slightest credence.

The aggregate of these loans which he claims to have borrowed from relatives and to have repaid are as follows:

| | |
|---|---:|
| Samuel Katz, cousin | $1,500 00 |
| Moses Katz, brother | 2,087 45 |
| Emanuel Katz, brother | 1,200 00 |
| Abe Cooper, relative | 2,200 00 |
| Father | 2,800 00 |

The referee has found it an exceedingly difficult matter to arrive at a specific sum which he can conclude has been positively secreted by the bankrupt and withheld from his creditors, but is of the opinion that the sums represented by:

| | |
|---|---:|
| Withdrawn by the bankrupt from August 19th to August 26th, inclusive | $6,300 00 |
| Moneys collected from debtors of the bankrupt during August, in cash | 5,707 43 |
| | $12,007 43 |

—have been established beyond any reasonable doubt.

The referee is also convinced that all of the alleged transactions concerning loans from the bankrupt's relatives are fictitious, and that the sum of $1,500 claimed to have been paid to Samuel Katz, of York, and by Samuel Katz, acknowledged to have been repaid to him, should be returned to the creditors; that the sum of $2,087.45 claimed to have been paid to Moses Katz in August, 1912, and by Moses Katz acknowledged to have been paid, should be returned to the creditors; that the sum of $1,200 claimed to have

been borrowed from the bankrupt's brother,. Emanuel Katz, and subsequently repaid to Emanuel. and acknowledged by him to have been repaid, should be returned to the creditors; and that the sum of $2,800 alleged to have been borrowed from the father was not in fact borrowed from him, but was furnished to the father by the bankrupt for the purpose of taking an assignment of the chattel mortgage for this sum, and which mortgage was held by Michael Georgetti and subsequently assigned to the father of the bankrupt.

I therefore conclude that at least $4,787.45, which represents the sums alleged to have been borrowed from Samuel, Moses, and Emanuel Katz, and by them admitted to have been paid to them, should be returned to the creditors; but I cannot determine positively that these sums are now under the control of the bankrupt, and, in view of the decisions holding that an order to return assets may only include assets under the control of the bankrupt, I am of the opinion that these sums cannot be reached by this procedure, although I am convinced, if the bankrupt paid them to his relatives, which I do not believe to be the case, this method of disposing of these moneys was a mere subterfuge to evade payment to his creditors, and that they have been returned to him or are still held for his benefit.

The testimony of the bankrupt in many particulars, as well as the testimony of the members of his family brought to corroborate his testimony, was proven to be false and untrustworthy in many particulars and entirely unworthy of belief. The attitude of the bankrupt, and his testimony concerning his books, and the efforts made by him to suppress the books, and to doctor them, by substituting new books, is indicative of his entire business career. All of his books, except the bank deposit books, have disappeared, and it is significant that the books of account were in his place of business up to within a few days of the day of the closing, so that this disappearance of the books has effectually destroyed all opportunity to verify or deny both his probable and improbable statements.

The testimony taken on the original examination of the bankrupt and that subsequently taken on the rule to show cause does not harmonize in many particulars, and indicates an effort on the part of the bankrupt to explain discrepancies which were not fairly or fully explained. The attitude of the witnesses on behalf of the bankrupt, as well as his own attitude, was such as to be convincing to the referee that a studious effort was being made to conceal the truth with regard to the bankrupt's affairs, and this attitude was particularly apparent and to such an extent as to elicit comment from persons who were in attendance during the whole proceedings.

A fair preponderance of evidence is convincing to the referee that the bankrupt has fraudulently withheld from his creditors at least $12,007.43, and that the sum is now in the possession and control of the said Harry L. Katz, bankrupt, and that it should be surrendered to the trustee for the benefit of the creditors of the estate, and upon presentation an order will be signed directing the bankrupt to turn over to the trustee this sum.

The bankrupt filed exceptions to the foregoing report of the referee,. and these were argued by the respective attorneys.

Clarence L. Goldenberg, of Atlantic City, N. J., for trustee.

Bolte & Sooy, of Atlantic City, N. J., for the bankrupt.

CROSS, District Judge. The petition for review brings before the court an order of the referee to whom the cause was referred, dated April 15, 1913, directing the bankrupt to account for and pay over to the trustee within ten days the sum of $12,007.43 belonging to the bankrupt's estate, and found by the referee to be in his possession and under his control. The petitioner excepted to that order in six respects, the first two of which relate to the form of the trustee's petition. The petition excepted to, however, was the original and not the amended one, as appears by reference made to its filing date in the

petition for review. To the trustee's amended petition no specific exceptions appear; but if the exceptions are so directed that they could be held to apply to the amended petition, they would nevertheless have to be overruled, since its allegations are deemed sufficiently certain and specific to apprise the respondent of the claim made against him. The remaining four exceptions relate to matters upon which the referee has passed, with result unsatisfactory to the bankrupt, hence his appeal. Of that concerning the admission of testimony, it may be said that such testimony, if any, as was improperly admitted, was relatively immaterial and did not affect the referee's decision; in other words, there was legal testimony amply sufficient to support his findings of fact.

In compliance with Order 27 of General Orders in Bankruptcy,[1] the referee by his certificate states that he has certified to this court the question presented, a summary of the evidence relating thereto, and the findings and order of the referee thereon. The summary of the evidence thus certified has not, so far as appears, been attacked in such manner as to bring to the attention of the court, for correction, any particular misstatement, defect, insufficiency, or error therein. However, and apart from that fact, all of the testimony taken by the referee was sent up by him and has been read and considered by the court upon this appeal, and the conclusion reached, without difficulty, that the order appealed from is supported by a preponderance of such evidence. Many glaring discrepancies and inconsistencies, and improbable and unreasonable statements, appear in the bankrupt's proofs, a considerable number of which have been pointed out by the referee. When these are considered, and the fact kept in mind that he saw the witnesses and heard them give their testimony, the court would be loath to set aside, and indeed, under the authorities, would not be justified in setting aside, his order, except for gross and manifest mistake of law or fact, neither of which appears. I am not at all sure that, had I dealt with the case in the first instance, I would not have ordered the bankrupt to restore to the estate, a considerably larger amount than the referee has.

However, I am not called to pass upon that question. It is sufficient to say that in my judgment the order under review is supported by the clear weight of the testimony, and it will accordingly in all respects be affirmed.

The attorneys for the bankrupt appealed from the judgment entered on the foregoing opinion to the Circuit Court of Appeals for the Third Circuit. They failed to prosecute the appeal within the time required by the rules, and, on motion of the attorney for the trustee, the appeal was dismissed. A petition was then filed with the referee by the trustee, praying for an order to require the bankrupt to turn over to the trustee the sum of $12,007.43, and the referee allowed this order. The bankrupt disregarded the order, whereupon the trustee filed with the referee a petition asking that the bankrupt be certified to the District Court for contempt for failure to obey the order to surrender. The referee so certified. As a result of this certificate the court entered an order that the proceedings be referred to the referee as special master, to ascertain "what, if any, disposition the bankrupt has made of the moneys found to have been in his possession and under his control on April 13, 1913, and if any disposition has been made of such moneys, or if the condition of the bankrupt has changed financially since that time, then, if

[1] 89 Fed. xi, 32 C. C. A. xxvii.

changed, in what way, and what are the reasons therefor, and to report the result of his examination and findings to this court." After the usual recitals, and a summary of the specific issues raised by the petition and answer, upon which the order of reference was based, the following additional report was filed by Chandler, Special Master:

### Findings of Fact.

The only witness produced was the bankrupt, who testified that he did not desire to change any of the testimony given by him at former hearings; that he has not in his possession the amount of money specified in the order or any part thereof; that he did not have the amount of money specified in the order, or any part of it, in his possession at the time the order was made; and that he has made efforts to comply with the order.

The order of reference to me is specifically directed to ascertain what dispositions the bankrupt has made of the moneys in his possession or under his control. He denied the money was in his possession when the order was made. He offered no testimony whatever concerning the moneys under his control.

Neither did he offer any testimony to show that his financial condition has changed, except that he is earning a salary of $2,100 per annum.

My conclusions, as a result of this examination, are that the bankrupt has failed to show any reasons why he should not surrender the money, or sufficient reason why he should not be committed for contempt for his refusal to obey the order.

### Conclusions of Law.

In his opinion filed in this case Judge Cross found that the bankrupt had in his possession or under his control the sum of $12,007.43, which he was fraudulently withholding from his creditors on the 15th day of April and 16th day of June, 1913, and ordered this sum to be surrendered to the trustee. This question is therefore res adjudicata, and any testimony of the bankrupt to the effect that he did not have or control this money when the order was made is irrelevant. "Where, after a hearing upon a petition by the trustee to compel bankrupt to turn over assets, the referee ordered him to deliver to the trustee goods in a specified sum, and upon review the District Court approved and confirmed the order of the referee and ordered bankrupts to turn over the goods or pay a specified sum before a day certain, or if he did not to show cause on that day why he should not be punished for contempt, the District Court is not bound to make a new and independent investigation of the fact of the concealment of assets and of bankrupt's present ability to comply with the order to turn over such assets to his trustee." Kirsner v. Taliaferro (C. C. A., 4th Cir.) 29 Am. Bankr. Rep. 832, 833, 202 Fed. 51, 120 C. C. A. 305.

The bankrupt testified that he has been unable to earn or borrow a sufficient amount to comply with the order of the court. I am of the opinion that these facts, if they are facts, have no relevancy to the question of his ability to surrender money in his possession or under his control. The bankrupt's testimony concerning his ability to raise money impresses me with the belief that he is endeavoring to make terms with the court, favorable to himself, in order to escape a full compliance with the order.